v. Reeves Family Trust. Good morning, Your Honors. May it please the court, Alan Greenberg for the appellants. A lot of cases were cited by both sides, of course. The implied covenant has been used in all of those cases, if at all, to prevent one party from depriving the other party of a contractual benefit. The implied covenant does not apply where the counterparty receives the exact thing that it contracted for. Just before you launch into that, there are no disputed factual issues here, is that right? I believe that is correct. There were cross motions based on essentially undisputed facts. That's correct. And the argument is that the contract literally gave your clients the right to personally buy products to inflate the sales. The contract actually does not even address who buys anything. What the contract says is that there was a mutual exchange, which is what a contract is. It just says if gross profits, as defined under generally accepted accounting principles, reach a certain limit, then the result of that is payment of an earn out. Or they don't even call it an earn out, I believe, but of compensation. And so there's nothing in the contract, in this purchase agreement, that even covers the idea of who is going to buy the product. There's nothing that even covers it. Isn't that precisely the kind of case where good faith and fair dealing come into play? No, not at all, because what it does cover is how the exchange is. The exchange is gross profit under gap for payment. That is what the contract provides. The two parties agreed to that. And it was heavily negotiated to provide the most flexibility to the sellers to be able to sell any product to do that. What was the purpose of the earn out provision? I'm sorry? What was the purpose of the earn out provision? The purpose was more than one purpose, but the purpose is primarily an incentive. In fact, in not every case. No, it was to set up, it was also, and primarily, I think, because they couldn't agree on a purchase price. So, and when you can't agree on a purchase price, you make some of the payment up front, and then you have the rest of it depend upon the performance of the company in the future. And then that determines what the purchase price will ultimately be, correct? No, your honor. There was no disagreement about the purchase price. No, there was. The parties could have said 65 million, right? They didn't. They said 40 million and then an earn outs. They did that. The contract says what it says. The reason they did that, right, was because they couldn't determine the value of the company. They wanted to have the benefit of future sales in order to determine the value of this company. That's not at all what the contract provides. In order to effectuate a purchase price that made sense. Your honor, it's so important that, and this case is so important because of this concept. Earn outs are used all the time in these acquisitions. The parties need to get the earn out correct in the contract to align the party's interests correctly and then to follow that earn out. The parties have so much at stake when they're in this situation. The sellers in this case relied on what it says in the contract and now because, and it's supposed to be aligning the party's interests. Buyers want a price, ultimately, they pay a price that's the true value of the company. I mean, isn't that the purpose of this provision? No, your honor. No, it isn't. Your honor, the buyer wants to pay the least that it can pay. That has nothing to do with it. The buyer wants to pay the least it can pay and the seller wants to get the most it can get. That's free enterprise. They couldn't agree on a price, apparently. They agreed on an earn out, but it was an earn out that was going to depend upon how the company performed, correct? Again, I respectfully disagree. It had nothing to do with how the company was going to perform. It had to do with what it says in the contract. Yes, by perform we mean gross profit under gap. Let's suppose that you're right and it's not an earn out, but it's some kind of bonus provision or incentive provision to make these guys manage the company well. Is that the idea that you're suggesting it may be that? To manage it at all. They could have walked away. Okay, well fine. So let's suppose it's that. Doesn't that also presuppose that the profits that are made that make it worth keeping these guys on are legitimate profits and not fake profits? They're not fake profits. They're real profits. No, they're not. They're fake profits. If you're trying to assess the performance of managers of a company, the fact that the managers make profits by paying money themselves at an inflated price to make it look as if they sold things that were not part of the regular course of business. Why would that, in any legitimate sense, earn a bonus? This is not an employment contract with a bonus. It's a sale of a company. It's not that either. It's not an earn out, and it's not an incentive provision, and it's not a bonus. It's an earn out. It's what exactly? It's an earn out, but it's a contract. In every case, as in the global recase that we filed this week, the recent case from the New York Court of Appeals. The New York Court of Appeals looks at a contract, and it says, what did the parties agree in this contract? Learned Hand just talked about the intent of a contract, and you can have 20 bishops line up and say what the intent was, but if it's not in the contract, it doesn't count. The contract has a formality to it. What's in the contract- What is the role of the covenant of good faith? It's not to prevent someone from exploiting loopholes in contracts just like this. It is to safeguard the express, explicitly bargained for benefits. And that's, we cited the CSI case for that, but we traced back that quote, and it goes back to Judge Walker in the MetLife case. Do clients not artificially inflate sales? Well, that's a term that's not, I think- Well, it wasn't the public buying the product. They did buy the product. It wasn't consumers buying the product. They bought the product. They bought the product to boost the sales. They asked to buy the product to create the gross profit that was called for under the contract with their own money. Do you think that the parties intended when they entered into the purchase agreement and the rollout provision that the sellers could, on their own, buy $4 million worth of stickers to get a $10 million payout? Do you think that was- Sellers certainly intended that they would be able to achieve gross profit under GAAP at any rate. That's why they thought that they had, they exchanged emails saying they thought they had really scored on this one. This is the rare case, it seems to me, where there's evidence of actual subjective bad faith. We're not inferring anything. It's not bad faith, Your Honor. It's just being viewed through a prism. The CEO said, a deal's a deal, follow this deal, get us gross profit, and we want you to do it. And they went out and they did it. They thought that they had scored in the sense that they did what they were supposed to do. Not acting in good faith. If the two sides get what they bargained for that's in the contract, absolutely. You can't have bad faith to deliver what's in the contract. There's not one case. This would be the first case where that ever happened. There's not one case. That's what these fellows said. This is going to make history. All right. That's not the history that they were trying to make. And it's actually the MetLife case. I think it is the history they were trying to make. But they were trying to get over on somebody. That's the history they were trying to make. No, they were trying to get the money they deserved under a contract that they made. And not to have to defend it when they followed the contract. Your position is they deserved the $10 million. Absolutely. They earned it under the terms of their contract with the other side, which is what contracts are. The other side was not a little old feeble person who they took advantage of. It's a big company that had lawyers that made a contract where the CEO waved it around and said, follow this contract. And they followed the contract. And they shouldn't have to be in court defending it. Thank you. Thank you, sir. We have some time for rebuttal. We'll hear from the other side. Good morning, your honors. Adam Offenhearts with Gibson Dunn, counsel for the appellee Vista Outdoors. I would just like to stress a few points very quickly. First of all, as you can imagine, Vista believes this is the paradigmatic case regarding the good faith and fair dealing. The covenant of good faith and fair dealing. As the court elicited from my adversary, there is no provision expressly detailing what is or is not an appropriate transaction. My adversary conceded that. His belief is that, therefore, any transaction, even one that evinces bad faith, is appropriate. That flies in the face of well settled New York law regarding the covenant of good faith and fair dealing. I have a question, though. You brought a declaratory judgment action, correct? Yes, your honor. And also a breach of contract, a breach of the applied covenant action. Yes, your honor. How is there a breach here when it was never consummated? Well, your honor, Judge Walker, that's a very good question. The breach of the contract is that they took a number of steps to effectuate their scheme. Including- The covenant was to complete the scheme, wasn't it? Was it not? And the covenant would be breached if they completed the scheme. But here there was no completion. So it's hard for me to see how the breach occurred. Well, your honor, we contend that the breach occurred, or certainly all the elements of a breach of contract- They thought about it. They planned it. And maybe a declaratory judgment that had they followed through, it would have breached it, would be possible. But where was the actual breach? Because you stopped it. You found out, you figured out what was happening, and it never happened. Your honor, all the elements- I'm not sure it really makes much difference in terms of the outcome of the case, in terms of the consequences, financial consequences. Judge Walker, you raised an excellent question. All the elements of the breach of the covenant of good faith and fair dealing were in place, and the cause of action arose at least no later than when Vista paid $60,500 for these ill-gotten stickers. Because at that- But as I understand it, that was an independent decision. I don't think Vista, when they bought the stickers, felt, and I thought the evidence in the record was, when they bought the stickers, they just said, well, this is swag, it can be used in the future, and so forth. There's no indication that they were cajoled into buying the stickers, and that it wasn't made, it wasn't an independent business decision. Well, actually, your honor, respectfully, Judge Walker, if you look at the emails regarding the purchase of the stickers, these are in the appendix at Supplemental Appendix 555, Supplemental Appendix 1093, Supplemental Appendix 553. These are a series of emails in April of 2016. I'm sorry, what were the dates again? What were the, this is in the appendix, right? Yes, your honor. It's Supplemental Appendix at page 1093, 1093. It's an April 27th email from Kyle Reeves to Attrish Johnson regarding the stickers. And Mr. Reeves writes, as part of his scheme, I want these, the stickers, in the system so we can pay for them ASAP next week. We need these not only to sell direct online, but to be able to pull out of inventory this summer for all of the trade show giveaways, outdoor retailer, etc. And you're saying that's a lie? Yes, your honor, because- If that's a lie, that's a behavior that is not in good faith, whether or not the ultimate transaction that gets them $10 million is consummated. Absolutely, Judge. If they got the $10 million, you'd be suing to get it back. Absolutely, your honor. And since they didn't, you're saying they were still scheming to engage, they engaged in a bad faith course of dealing with your client, which is not in accordance with the contract? Yes, because certainly as of the time of this email, they knew they were going to be buying the stickers. Now of course, you still have the stickers. Your honor. And you're using them, apparently. As I understand it, they are given to the manager of the company to use in the way that that email suggests. Well, respectfully, your honor, two very important points on that. First of all, it is one thing to have a handful of stickers that are periodically handed out. It's another thing entirely to have a million stickers that might be a supply for decades. And also, your honor, there's- That's possibly true, but is there not, I mean, this goes to a slightly different question for me. Is there not an issue of fact as to what, if anything, is the fair market value of the stickers? Well, your honor, on this, this might be one of the few issues upon which my adversary and I agree. I don't think there are any disputed facts. The record below is clear that Vista wrote off the $60,500. It took a hit of $60,500 on its accountant. Yeah, now you're talking like him. That's what the gap says. But in real life, they have the stickers. They're using them for a particular purpose. They have them up for sale on the website if anybody's going to buy them. If somebody buys one for $5, isn't that $5 less than $60,000 worth of damages? First of all, your honor, there's nothing in the record to indicate that these things are on sale. I do not believe that they are on sale. I believe that the logo for Jimmy Sticks has been changed. These stickers are virtually of no value. But importantly, your honor, and I should have raised this originally, my apologies, there's nothing in the record about the value of these stickers. My adversary moved for summary judgment, trying to dismiss our claims, and moved on his claims. They said- But both parties can be wrong, right? Often both parties say there are no disputed issues of fact. But it turns out that's because they each have different issues of fact that they say are undisputed. And summary judgment on some issue may not be appropriate after all. Certainly, your honor. But Judge Lynch, if I may, there is no evidence from my adversary. There is no evidence from the appellants below on the value of the stickers. They had the opportunity during summary judgment to put in an affidavit saying we think these stickers are very valuable. What did you put in as to the value of the stickers? Judge Chen, we put in testimony from one of the senior accounting officers saying these stickers had been written off. And there is nothing to rebut that testimony. So you took a position that they were, I guess, worthless, but now you're being able to market them. And wouldn't you have a duty to mitigate anyway? I mean, to get something for them? Your honor, we are not marketing them. We are not using them. There's nothing in the record to indicate that. That's something that my adversary included in their briefing that is unsupported in the record. We do have a duty to mitigate. There's nothing in the record that suggests they were being used as swag. Your honor, certainly they could have, and I have no doubt that a occasional sticker was handed out or given to someone. But we're talking about a million stickers, pallet fulls of stickers that are entirely different issues. $60,000 got how many stickers? Close to a million stickers, your honor. And the thought that a few stickers, a handful of stickers could be given away somehow negates the harm that Vista suffered to put an end to this scheme, we think is unfair. I'm talking about $60,000 anyway. Let's talk about a different trivial amount of money in comparison to the whole case. But I'm having a little trouble understanding the business issues about whether Mr. Wilkins paid his half or not. I understand the legal argument that both sellers are jointly and severally liable under the contract for the total amount as of before the email exchange. But then there's an email where Mr. Wilkins says, so are you asking for three checks, two from the Wilkinses that add up to $60,000 and one from the Reeves Family Trust for another $60,000 approximately. I don't see where that comes from. There may have been all kinds of discussions between the parties. But this does not sound like, is it okay if we send you checks in the following form? He says, are you asking for this? Is there no issue of fact as to what that means? Well, Your Honor, respectfully, Judge Lynch, we think that the contract at section 2.5 is clear, that this money is owed by the sellers. And there's an integration clause that says this can't be modified. Right, without a written waiver. And we think that an email is not sufficient. Moreover, simply no prejudice. What was the significance of the email then? What was the significance of the email? Is it just, this is a convenient way for you guys to do it, is that? Your Honor, I think you're exactly right. It was convenience. If, obviously, you are all responsible for the entire payment. If you want to pay us two checks and have someone write a third, that totals the full amount. So be it. Again, there was no prejudice with this. And allowing parties to pay an amount they owe jointly and severally by different checks is not the same as a written amendment saying, we hereby forego our right to collect the full amount. And in any event, there's no prejudice. If the Wilkins feel that that money is owed them by Mr. Reeves, yeah, I'm sorry, if the Wilkins feel that Mr. Reeves owes them $60,000, they're free to seek contribution from him. Thank you. Thank you very much. Hear the rebuttal. Thank you, Your Honors. First, I just want to emphasize one more point that the cases say you cannot use the implied covenant to add wholly new terms to a contract. With respect to damages, counsel conceded that there's nothing in the record. The burden was on them. They moved for some. He conceded that there was nothing on the record submitted by your side. They put in evidence saying that they wrote off the 60,000 and the stickers were worthless. No, they did not say they were worthless. They said in the record that they wrote off, he did say, I didn't mean to misquote him. I think he did say there's nothing in the record, then later he said by us. He also did say, and it's correct, that there's a declaration from an accountant who doesn't know anything about the stickers, was not shown to have any knowledge, that they wrote off the stickers. Is there anything in the record to suggest that these million stickers had any value? Yes, they were used and continue to be used. And- What is there in the record that says that? It's on page, one second. On page 826 of the appendix is the testimony by a Vista executive who was asked what happened to the stickers and he said, we gave them to Wim de Jager so he could use them in promotions and other things as he sees fit now that he's the head of water sports. And they still have, they don't have any declaration that says that they got rid of the stickers or they're not using them. The fact there's a million stickers, it sounds like a lot. But this outdoor retailer show that is mentioned in the email, the council mentioned, is a huge trade show with tens of thousands of people. A million stickers is not that many stickers for marketing. These are four different types of stickers. Is there anything in the record that talks about what are typical quantities of stickers to be purchased? I don't know. I don't know that there's such a thing as a typical quantity. I suppose the best thing you've got going for you on this score is that when your client sent the original proposal to purchase $60,000 worth of stickers, nobody said $60,000 worth, why are we doing that? No one complained and the head of global operations approved the transaction, which they then alleged falsely was something that was done out of the ordinary channels. It was done correctly through channels, completely transparent. They're using the stickers for exactly what was said, that they would be, they could sell them, they could use them in marketing. That's exactly what the email says. Or you say, they could buy them themselves for $4 million so as to inflate the profits that it looks like the company is making. Well, it would have made those profits under GAAP if that transaction had been permitted to go forward, but they blocked it. But they were not damaged in any way. And certainly not under the purchase agreement, which doesn't have anything to do with stickers or ordering stickers. Meaning, when I say stickers or ordering, I mean from the manufacturer. The acquisition of the stickers by Vista is not something that's dealt with in any way in that purchase agreement. The purchase agreement deals with buying the company and then this earn out, that's it. So they didn't sue for other things. They sued for breach of the implied covenant in this purchase agreement. And there's nothing in there that governs the actions of the people in ordering stickers from China for the company to use for anything, for selling to the founders or from using in marketing or anything else. And I just want to reference the court to one page in particular on the purchase price adjustment. On page 953 of the appellant's appendix is a page from the declaration of Jeremy Wilkins. Where he explains that he paid and his wife paid their half as an expedient. He didn't necessarily agree with the amount. So he relied on paying half. There's an estoppel here where he's told to pay half. And he could have objected or questioned it. It was a liable jointly and separately though under the original agreement, yes. But Mr. Reeves, who was not a party to that contract, the Reeves Family Trust, which his mother in Canada was the trustee, never got notice of this second superseding amended closing statement, the company never asked them for the money and never told them how much to pay other than the original one they did send for a higher amount. But Mr. Reeves, it's in the record, he knew- Mr. Reeves and the Reeves Family Trust did not object to, Mr. Wilkins objected to it. He didn't object to it, he just questioned it. He asked a question. He said, hey, is this right? He said, this isn't the right amount, let's look at it again. They look at it again, they reduce the amount. Isn't Mr. Wilkins negotiating on behalf of both of them? Or are you saying that Mr. Reeves or the Reeves Trust still owes the larger amount because they never questioned it? I don't know the larger amount because the larger amount was retracted and said to be an error by this- Why did they get the benefit of Mr. Wilkins' negotiation? Isn't that because Mr. Wilkins is negotiating on behalf of everyone? He's not, though. He's just asking a question. Does this, this looks wrong, and they write back and say, we look another look, it's wrong. Here's the correct amount, but they never sent it to the trust or asked them to pay the amount.  We will reserve decision. Thank you, Your Honor. Thank you.